20-11988-BB

UNITED STATES COURT OF APPEALS

ELEVENTH CIRCUIT

DAISY MILLER,
Appellant.

-vs-

UNITED STATES OF AMERICA,
Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

**INITIAL BRIEF OF APPELLANT**

Gennaro Cariglio Jr.
8101 Biscayne Blvd.
Penthouse 701
Miami, Fl 33138
Florida Bar#: 51985
(305) 899-0438
Counsel for the Appellant
Sobeachlaw@aol.com

**United States v. Daisy Miller, 20-11988-BB**
**Certificate of Interested Persons and Corporate Disclosure Statement**

Appellant files this Certificate of Interested Persons and Corporate

Disclosure Statement, listing the parties and entities interested in this appeal, as

required by 11th Cir. R. 26.1:

Aaron Zury Irrevocable Trust

Arnall, Golden Gregory

Abraham, Timothy J.

Adams, Angela

Bangos, Nicolas Basil

Beckerleg , Jr., William H.

Blumenfeld, Jack Ross

Bradylyons, Drew

Bragman, Karen B.

Campion, Tara A.

Cariglio Jr., Gennaro

Caruso, Michael

Chen, Vanessa

Clingan, Sara M.

**United States v. Daisy Miller, 20-11988-BB**
**Certificate of Interested Persons and Corporate Disclosure Statement**
**(Cont.)**

Coloma, Christian

Danzig, Aaron

Danziger, Jeffrey, Dr.

De Boer, Jamie

Descalzo, Marissel

Donlan, Maureen

Donner, Amber

Dougherty, Adam Todd

Dreispul, Tracy

Ellickson, Jenny C.

English, Richard

Fajardo Oshan, Ariana

Ferrer, Wifredo A.

Fields, Carlton

Gainor, Ronald

Garber, Hon. Barry L.

Goldberger, Jack Alan

**United States v. Daisy Miller, 20-11988-BB**
**Certificate of Interested Persons and Corporate Disclosure Statement**
**(Cont.)**

Goodman, Hon. Jonathan

Goswami-Maken, Debbie

Greenberg, Benjamin G.

Grosnoff, Nicole

Haddad, Fred

Harper, Brooke

Herlee Management Co., Inc.

High Ridge Management Corp.

Himmons, Gloria

Hollywood Hills Rehabilitation Center, LLC

Hollywood Pavilion, LLC

Hollywood Property Investment, LLC

Hough, John Harrison

James, Susan G.

Jarrett, Julia

Kallen, Kenneth

Kallen, Leonore

**United States v. Daisy Miller, 20-11988-BB**
**Certificate of Interested Persons and Corporate Disclosure Statement**
**(Cont.)**

Kallen, Philip S.

Kallen, Yvonne

Kallen-Zury, Karen

Kent, William Mallory

KeyBank, N.A.

Larkin Community Hospital Behavior Health Services, Inc.

Lord, Sara M.

Malone Law Firm

Malone, Todd Omar

Martinez, Hon. Jose E.

McAliley, Hon. Chris M.

McNamara, Anne

Medicare and Medicaid Services

Miller, Daisy

Miller, Walter Dale

Morin, Aileen

O'Sullivan, Hon. John J.

**United States v. Daisy Miller, 20-11988-BB**
**Certificate of Interested Persons and Corporate Disclosure Statement**
**(Cont.)**

Palermo, Hon. Peter R.

Pasano, Michael S.

Patel, Kashyap

Petrie, Michele

Petruzzi, Paul Domenic

Rasco, Guy Austin

Reinhart, Bruce

Rivero, Laura Thomas

Rodriguez, Daniel L.

Rogow, Bruce S.

Rosado, Vivian

Ruiz, Riselda, R.

Salyer, Kathleen M.

Samuel, Donald F.

Sanders, Jeremy Raymond

Schwartz, Fred Arthur

Shepherd, William Newton

**United States v. Daisy Miller, 20-11988-BB**
**Certificate of Interested Persons and Corporate Disclosure Statement**
**(Cont.)**

Simonton, Hon. Andrea M.

Sleiman, Rachel

Surmacz, Nicholas E.

Smachetti, Emily M.

Snider, David A.

Stabilis Fund 2, LLC

Tamir Zury Life Insurance Trust

Team Placement Consulting, Inc.

Turnoff, Hon. William C.

Toth, Brian

Veraguas, Jean Luc

Warren, Andrew H.

Zimet, Bruce Alan

Zink, Robert

Zury, Tamir

 Counsel certifies that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

## **Statement Regarding Oral Argument**

Daisy Miller requests oral argument to supplement this brief.  The issues in this case are not adequately reflected by the record and would be aided by oral argument.

# Table of Contents

**Page**

Certificate of Interested Persons                                          c-1

Statement Regarding Oral Argument                                 i

Table of Citations                                                             v

Statement of Subject-Matter and Appellate Jurisdiction    viii

Statement of the Issues                                                    1

Statement of the Case                                                      1

Summary of the Argument                                              23

Argument and Citations of Authority                             25

**I. COUNSEL'S FAILURE TO CALL ANY TRIAL WITNESSES WAS AN UNINFORMED DECISION WHICH CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL**    25

**a.    The Court's Ruling**                                              25

**b.    The Legal Standard**                                            26

**c.    The Government's Theory of the Case**              26

**d.    Counsel's Performance was Constitutionally Deficient**    28

    **1. The Court Used the Wrong Legal Standard in Assessing the Performance Prong of *Strickland***    28

    **2. Counsel's Investigation was Incomplete**    29

**Table of Contents (Cont.)**

|  | Page |
|---|---|
| **A. Dr. Danziger or a Medical Expert** | 36 |
| **B. Fact Witnesses** | 39 |
| **i. Melvin Hunter, Michael Calabria, and Robin Smith** | 40 |
| **ii. Rita Sordellini and Roy Rindom** | 41 |
| **iii. Manuel Llano and Dr. Michael Piercey** | 41 |
| **iv. Karen Bryan** | 41 |
| **v.  Sandra Novack** | 42 |
| **e. Miller was Prejudiced as a Result of Trial Counsel's Ineffectiveness** | 42 |
| **1. Dr. Danziger or a Medical Expert** | 43 |
| **2. Robin Smith** | 45 |
| **3. Rita Sordellini** | 45 |
| **4. Sandra Novack, Roy Rindom, Michael Calabria and Karen Bryan** | 45 |
| **5. Melvin Hunter** | 45 |
| **6. Manuel Llano and Dr. Michael Piercey** | 46 |

## <u>Table of Contents(Cont.)</u>

|  | <u>**Page**</u> |
|---|---|
| Conclusion | 46 |
| Certificate of Compliance with Type Style and Volume | 46 |
| Certificate of Compliance with Electronic Filing | 47 |
| Certificate of Service | 47 |

## Table of Citations

**Cases**:                                                                                    **Page**

*\*Anderson v. Johnson,* 338 F.3d 382 (5th Cir. 2003)                    31

*\*Bell v. Miller,* 500 F.3d 149 (2d Cir. 2007)                               31

*\*Bigelow v. Haviland,* 576 F.3d 284, rehearing denied,
582 F.3d 670 (6th Cir. 2009)                                                     31

*\*Bryant v. Scott,* 28 F.3d 1411 (5th Cir.1994)                            30

*\*Cannedy v. Adams,* 706 F.3d 1148 (9th Cir. 2013)                     31

*Chandler v. United States,* 218 F.3d 1305 (11th Cir. 2000)          26,28,35

*Chateloin v. Singletary,* 89 F.3d 749 (11th Cir. 1996)                 28

*Clinkscale v. Carter*, 375 F. 3d 430 (6th Cir. 2004)                     30

*Combs v. Coyle*, 205 F. 3d 269 (6th Cir. 2000)                           30

*\*Cooper v. Secretary, Dept. of Corrections,* 646 F.3d 1328,
(11th Cir. 2011)                                                                       30

*\*Couch v. Booker*, 632 F.3d 241 (6th Cir. 2011)                         31

*\*Duncan v. Ornoski,* 528 F.3d 1222 (9th Cir. 2008)                     31

*\*English v. Romanowski,* 602 F.3d 714 (6th Cir. 2010)                31

*\*Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011)                          31

*\*Foster v. Wolfenbarger*, 687 F.3d 702 (6th Cir. 2012)               31

*\*Goodman v. Betrand,* 467 F.3d 1022 (6th Cir. 2006)                 31

v

## Table of Citations (cont.)

**Cases:**                                                                    **Page**

*Henderson v. Sargent,* 926 F.2d 706 (8th Cir.1991)                30

*Horton v. Zant,* 941 F.2d 1449 (11th Cir.1991)                    30

*Kimmelman v. Morrison,* 477 U.S. 365, 384, 106 S.Ct. 2574,
91 L.Ed.2d 305 (1986)                                              30

*Johnson v. Secretary, Dept. of Corrections,* 643 F.3d 947
(11th Cir. 2011)                                                   31

*McClellan v. Rapelje,* 703 F.3d 344 (6th Cir. 2013)               31

*Ramonez v. Berghuis,* 490 F.3d 482 (6th Cir. 2007)                31

*Richey v. Bradshaw,* 498 F.3d 344 (6th Cir. 2007)                 31

*Roe v. Flores-Ortega,* 528 U.S. 470, 120 S.Ct. 1029,
145 L.Ed.2d 985 (2000)                                             30

*Strickland v. Washington*, 466 U.S. 668 (1984)                    26,29,30,34
                                                                   35
*Sussman v. Jenkins,* 636 F.3d 329 (7th Cir. 2011)                 31

*Thomas v. United States,* 572 F.3d 1300 (11th Cir.2009)           23

*Towns v. Smith,* 395 F. 3d 251 (6th Cir. 2005)                    30

*United States v. Gray,* 878 F.2d 702 (3d Cir. 1989)               31

*United States v. Kallen-Zury*, 1:17-cv-21269-JEM (SDFL)           38,39,44

*Wiggins v. Smith*, 539 U.S. 510 (2003)                            28-30,34,38

## **Table of Citations (cont.)**

**Cases:**                                                **Page**

*Williams v. Taylor,* 205 S. Ct. 1495 (2000)             29

**Statutes & Other Authorities:**

18 U.S.C. § 371                                          1

18 U.S.C. § 1343                                         1

18 U.S.C. § 1347                                         1

18 U.S.C. § 1349                                         1

18 U.S.C. § 3742                                         viii

28 U.S.C. § 1291                                         viii

28 U.S.C. § 2255                                         viii, 2

**<u>Statement of Subject-Matter and Appellate Jurisdiction</u>**

The District Court had jurisdiction of this case pursuant to 28 U.S.C. § 2255 because this was a Motion to Vacate a Judgment and Sentence from the United States District Court.  The court of appeals has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, which give the courts of appeals jurisdiction over all final decisions and sentences of the district courts of the United States.  The notice of appeal was filed on May 27, 2020, from the final order denying the Motion for Post-Conviction Relief entered on May 1, 2020.

## STATEMENT OF THE ISSUES

1.　　Whether trial counsel was constitutionally ineffective for failing to call witnesses at trial.

## STATEMENT OF THE CASE

The appellant was the Petitioner in the district court and will be referred to by name or as the Petitioner. The appellee, United States of America, will be referred to as the government. The record will be noted by reference to the district court docket entry number "DE".  Docket entries from the underlying criminal case (Case No. 12-20757-JEM) will be referred to as "CRDE". **The defendant is incarcerated.**

## A. Procedural History

On October 2, 2012, a sixteen count Indictment was returned against Karen Kallen-Zury, Daisy Miller, Christian Coloma, Michele Petrie and Gloria Himmons. CRDE-3. Miller was charged in nine counts: Conspiracy to Commit Health Care Fraud and Wire Fraud in violation of 18 U.S.C. § 1349 (Count 1); five counts of Wire Fraud in violation of 18 U.S.C. § 1343 (Counts 2-6); two counts of Health Care Fraud in violation of 18 U.S.C. § 1347 (Counts 7-8) and Conspiracy to Defraud the United States and to Pay and Receive Kickbacks in Connection with a Federal Health Care Benefit Program in violation of 18 U.S.C. § 371.  On November 2, 2012, Omar

1

Malone was appointed pursuant to the Criminal Justice Act to represent Miller.

On May 20, 2013, Kallen-Zury, Miller, Coloma, and Petrie proceeded to trial. CRDE-286. On June 28, 2013, after 26 days of trial the jury returned a verdict finding Kallen-Zury guilty on Counts 1-14, Miller guilty on Counts 1-9, Coloma guilty on Counts 9-14 and guilty on Counts 1,2,5 and 6 and not guilty on Counts 3 and 4. CRDE-405-408. On September 10, 2013, the Court sentenced Miller to a term of imprisonment of 180 months consisting of 120 months on Counts 1 through 8 to run concurrent to each other and consecutive to the 60 months term of imprisonment on Count 9. CRDE-536, 543. On January 20, 2016, this Court's Mandate issued affirming the Final Judgment. CRDE-717.

On March 25, 2016, Miller filed a Motion to Vacate Sentence pursuant to 28 U.S.C. § 2255. DE-1. The government filed a Memorandum in Opposition on August 19, 2016. DE-9. Miller then filed a Reply on September 19, 2016. DE-12. The government filed a Sur-Reply on May 14, 2018. DE-18. On November 2, 2018, the Court required Omar Malone to file an Affidavit or Declaration which he filed on November 19, 2018. DE-19, 22. Miller filed 10 affidavits in support of her motion. DE-21. On November 30, 2018, the Court scheduled an evidentiary hearing on the limited issue of defense counsel's failure to call any witnesses at trial other than Miller herself. DE-23. On February 5, 2019, Miller filed a Motion to Take

Judicial Notice of Dr. Danziger's testimony from co-defendant Kallen-Zury's Section 2255 habeas case, which was granted by the Court with the caveat that it was also taking judicial notice of attorney Michael Pasano's testimony from that same hearing.  DE-31, 33.  On April 4, 2019, Miller filed an affidavit from Dr. Danziger.  DE-47.  On April 4th and 5th, 2019, the court held an evidentiary hearing where Robin Smith, Manuel Llano, Dr. Michael Piercey, Rita Sordellini, Melvin Hunter, Daisy Miller and Omar Malone testified.   DE 50, 51.

On May 24, 2019, a Report and Recommendation ("R&R") was issued recommending that the motion be denied but that a certificate of appealability issue re: Malone's failure to call any trial witnesses other than Miller.  DE-59.  On June 24, 2019, the government filed objections to the R&R and Miller filed a Response in Opposition and Objections to the R&R on June 25, 2019.  DE-60, 61, 62. On May 1, 2020, the Court issued an Order adopting the R&R and denying Miller's motion while issuing a Certificate of Appealability.  DE-72.  On May 27, 2020, Miller filed a notice of appeal.  DE-73.  **Daisy Miller is currently incarcerated.**

**B. <u>Statement of Facts</u>**

   **1.  Excerpts From Dr. Gumer's Trial Testimony[1]**

---

[1] Due to word limitations, the excerpts focus on the evidence that counsel needed to rebut.  A comprehensive statement of facts is included in Miller's Initial Brief in Case#13-14144 (11th Cir) pp.3-40.

3

Dr. Gumer testified he "rubber-stamped" treatment for patients, **many of whom he claimed did not need admission. At trial, he estimated that greater than 99% of his patients needed hospitalization.** CRDE-312:93,95,104-105. Although during interviews with agents, Gumer first said 50% of the patients did not need hospitalization. CRDE-319:77. He later increased it to 75%. *Id.* at 79.

Gumer claimed he over-medicated his patients to justify their diagnosis. He claimed he routinely signed off on clinical treatment plans given to him by various people. *Id.* at 98-99. **He testified patients D.S. and S.M. ("victims" - counts 7, 8) did not need treatment.** *Id.* at 104-105.

Gumer alleged Miller encouraged him to keep patients at HP for 21 days, that he was pressured to admit patients by Kallen-Zury, and that Miller and the treatment team pressured him to discharge patients after 21 days. CRDE-312:115. Despite the fact that he was the Medical Director and the admitting psychiatrist, Gumer claims he raised concerns to Miller and others that patients did not need treatment. *Id.* at 97.

Gumer further claimed Miller told him about an unofficial "do-not-admit" list. The list purported to identify patients who had either given the hospital problems in the past or had poor or no health coverage. CRDE-312:101.

On cross, Gumer acknowledged the Joint Commission required all medical records be completed within 30 days and he was often late in signing them.

CRDE320:40-41. He acknowledged part of Miller's job was quality assurance and compliance with the Joint Commission. *Id.* at 45-46.

Gumer admitted that he signed "treatment team logs" following regular meetings to discuss patients, discharge planning, treatments, medication and follow-up. (RT 1450, 1453, 1504, 1514, 1515, 1516, 1552, 1562, 1563, 1564, 1585-1586, 1592). Gumer never reported any problems at treatment team or medical committee meetings between 2003 and 2011. (RT 1460, 1464, 1508-509). Gumer repeatedly said he was unsure of or could not recall some facts. CRDE319:55,60-62,64,69,74,79,84-85; CRDE320:53-54,56,60,63,70. As Medical Director, Gumer also met with the Joint Commission many times but never reported any problems. *Id.* at 98-99.

Prior to testimony, agents interviewed Gumer at least 25 times. During those meetings he told the FBI agents: 1) most patients at HP were dual diagnosed (CRDE319:62; CRDE320:93) and never claimed Miller pressured him to change any notes (or any other of the allegations he raised on direct). *Id.* at 52.

Interestingly, Gumer never looked at the two patient's files regarding Counts 7 and 8 before testifying they were improperly admitted for treatment. *Id.* at 71.

## 2. The Evidentiary Hearing

Robin Smith, Manuel Llano, Dr. Michael Piercey, Rita Sordellini, Melvin

5

Hunter and Miller all testified on her behalf. Miller also submitted sworn affidavits from Roy Rindom, Sandra Novack, Michael Calabria and Karen Bryan. The Court took judicial notice of Dr. Danziger's and Michael Pasano's testimony at Kallen-Zury's §2255 hearing. The government called Omar Malone as its only witness.

## A.    Robin Smith

The R&R found:

She reviewed several hundred patient files at HP during her tenure and never noticed any pattern of inconsistency between psychiatric assessments, social assessments, therapist notes, and discharge planning. She explained that Miller did not supervise the psychiatrists and did not tell them what to do. Miller was receptive to concerns about patient treatment, was committed to the patients, and displayed great concern for patient treatment. She was not aware of patients being admitted to HP without appropriate psychiatric criteria or patients with only substance abuse issues being admitted. In addition, she was not aware of patients who stayed at HP for the duration of Medicare coverage, as opposed to genuine psychiatric needs. She was not aware of Medicare benefits expirations playing a role in the decision to discharge patients. Similarly, she was not aware of a scenario where Miller ordered her (or anyone else) to discharge a patient because he or she had no remaining Medicare coverage. She was not aware that Dr. Gumer testified that 90% of the HP patients did not meet admission criteria but, once told, disagrees. She did not recall any other therapist complaining about inappropriate admissions and opined that Miller would not allow patients who did not need psychiatric treatment to remain just so HP could earn more money. She did, however, say that Dr. Gumer sometimes kept a patient at HP longer than might be indicated. Smith was not familiar with the "14-day rule" (concerning a memorandum where Miller explained that patients should be discharged after 14 days because Medicare benefits would start to run out at that point). She has no recollection of HP employees backfilling charts in preparation of an audit. Smith was not aware of trial testimony that Miller issued instructions to "stress the negative" in patient files so that Medicare would pay benefits but testified that Miller never told her to do that. She was not aware of a "do-not-admit" list for patients who had run out of Medicare coverage. **Neither**

**Malone nor anyone on his defense team contacted her for an interview before Miller's trial.** On cross-examination, Smith said she was not surprised that Miller described her as overtly ethical and said no one at HP ever discussed a fraud scheme with her. Federal investigators never interviewed her. Smith was not involved in financing and marketing decisions. She did not review all the patient records and notes authored by Dr. Gumer and was not reviewing the notes with an eye toward identifying inconsistencies. She thought that HP hired marketers but did not know if they were paid to bring in patients.

DE-59:72-73. (Emphasis added.)

## B.    Manuel Llano

The R&R found:

Llano is a healthcare executive who had been the CEO of the Sunrise Treatment Center, where he worked with Miller from 1999 through 2001 or early 2002. He testified that he viewed Miller as patient-centered, focused, and thorough. Llano kept in touch with Miller over the years and offered her a job at least twice. He said Miller rejected those offers because she said she was happy and enjoyed her work.

After Miller turned down both offers, he finally hired her in 2012, when he was COO of the High Point treatment facility. Llano said that Miller worked for only a week, but he had to terminate her because of her arrest.

Llano never worked at HP, was not aware of Miller's title at HP, never saw her interact with Kallen-Zury, never sat in on meetings at HP with Miller and others, never saw Miller interact with patients at HP, never reviewed patient charts or records from HP, knows nothing about instructions given to HP employees about marketing or making charts appear negative, and was not aware of the financial pressures at HP.

Llano worked with Dr. Gumer at the Sunrise facility, but he has no opinions about Dr. Gumer's ethics or work.

**Neither Malone nor his investigator contacted him before trial about testifying for Miller.**

7

DE-59:74 (Emphasis added.)

## C.    Dr. Michael Piercey

The R&R found:

Dr. Piercey and Llano acquired the Sunrise facility in 1999, and they sold it in 2002. He recalled interviewing Miller for a position in admissions and that she answered a hypothetical question by saying she would recommend against admission if a hospital's census dipped and a patient who did not meet admissions criteria needed psychiatric assistance.

In early 2012, he heard that HP was not doing well from a census perspective, and he discussed with the owner a possible lease of half the space. Miller gave him a tour of HP and, in his view, she seemed energetic, intelligent, and more mature. According to his assessment during the tour, Miller did not seem less patient-oriented.

After Miller was arrested in 2012, Dr. Piercey told her that she should contact him if she needed legal support and told her he would be delighted to work with her. **He did not recall speaking with Miller's trial attorney or investigator**…

…He also said that he was not Miller's supervisor when she worked at the Sunrise facility and last worked with her in 2002.

…Piercey said he is still willing to hire Miller, despite her conviction, and noted that he would still hire her again today.
DE-59:75. (Emphasis added.)

## D.    Rita Sordellini

The R&R found:

Sordellini has been a mental health therapist in South Florida for 40 years and was the dean of students at Barry University for 25 years. She became a part-time therapist at HP in 2005, working there until 2010. Although there might be notes in the patients' files from other therapists, she typically did not review them. The files

would include discharge planning. She would not make discharge recommendations, but she would review them and then discuss them with the patients.

She saw between six to nine patients per week, excluding those she saw in group sessions. She estimated that Gumer admitted a quarter of HP's patients. Sordellini said she never noticed a pattern of inconsistencies in the files and has no recollection of other therapists noting inconsistencies or other concerns about the patients' files. She also said that she saw no evidence that the patients did not need the services provided by HP.

Similarly, she said that no therapists ever expressed concerns to her about improperly admitted patients.

She described Miller as an "incredible leader" who is "trustworthy and amazing." She said Miller cared for patients "like no one else" and that Miller was the only reason she was at HP.

Sordellini said she did not see evidence of falsification in the entries and never saw or heard of a plan to "stress the negative" in patient files. She said that HP underwent audits and inspections and that she has no knowledge of anyone backfilling patient files because of upcoming audits or inspections.

Sordellini said she never saw treatment plans signed in blank and would have questioned it and brought it to Miller's attention if she had been aware of this type of scenario.

She denied having knowledge of Miller's alleged concern over how many remaining Medicare days a patient had and testified that Miller never told her that a patient needed to be discharged because he or she lacked Medicare coverage days. Likewise, she never heard anything about patients being admitted or discharged because of the presence or absence of Medicare coverage days.

She also denied hearing anything about Miller recommending the discharge of patients back to halfway houses in order to keep the halfway house referral source happy.

On cross-examination, Sordellini admitted that Malone sent her an email on

April 26, 2013, asking for her suggestions and to identify other potentially helpful witnesses. In that email, Malone gave her his cellphone number…

…An attorney for the Government showed Sordellini a document in which Miller explained that "payment plummets after stays over 14 days" and that "we will be better financially if patients stays are less than 14 days whenever possible." The document also stated that Miller explained that HP needed to "do something different" for patients with stays of more than 30 days. Sordellini said she was not there when Miller made the statements mentioned in the document. DE-59:76-78.

## E.    Melvin Hunter

The R&R found:

Hunter is the former admissions specialist at HP. He worked there for 14 years, from 2001 until his arrest. He was arrested after Miller's trial and prosecuted on fraud charges. He testified at his criminal trial, and a jury acquitted him of all charges. He also testified at the evidentiary hearing in Kallen-Zury's post-conviction habeas proceeding.

Hunter said he is not biased against the United States, does not harbor any resentment, and does not have an axe to grind against the Government. The R&R found this portion of his testimony to be not credible.

Based on advice from his attorney, Hunter refused to testify at the grand jury proceeding which ultimately led to the indictment against Kallen-Zury and Miller. Nevertheless, Hunter said he would have testified on Miller's behalf at her trial, even if his attorney advised him not to, because he believed the allegations against the hospital and its staff were false. **Hunter said that no one from Miller's trial team contacted him about testifying at the trial and that he would have appeared had he been asked.**

Hunter's job at HP was to take calls from potential patients, pre-screen them, and verify their insurance benefits (Medicare, private insurance, or self-pay). At the very end of the process, the psychiatrist would decide whether to admit a patient…

10

…Hunter noted that there was a list of patients who had no Medicare coverage, described as a "call before admission" list, kept in the administrative office. If no Medicare coverage was available, then a patient would be financially responsible for the charges. Hunter said that the list was not limited to Medicare coverage; it would also include potential patients who might have changed insurance plans…

…Miller's attorney asked Hunter about Dr. Gumer's testimony, at Miller's trial, that HP had a 90% admission rate. Hunter said this was incorrect. In fact, he said, less than 20% of the prospective patients who called were actually admitted. Hunter explained that there was a significant drop off in admissions from the initial phone calls to the hospital, where the potential patients were often disqualified.

According to Hunter, once a patient cleared all the hurdles, not all were actually admitted -- because they were rejected later at the psychiatric checkpoint. Thus, Hunter clarified, 30% of patients who made it through the psychiatric hurdle would not be admitted, but 70% would get admitted. Therefore, Hunter said, from a psychiatrist's perspective, it might seem like 70% (not Dr. Gumer's 90% trial testimony estimate) of the prospective patients were admitted…

…As explained by Hunter, even though he did not make the actual admissions decisions, no one ever told him to admit ineligible patients if they had Medicare coverage or private insurance. He said he was not aware of a policy that patients would remain for as long as Medicare coverage lasted or that patients would be discharged as soon as their Medicare coverage ended. He said that no one suggested discharge after 14 days…

Hunter said he was not aware of any fraud at HP and was not aware of HP kickbacks to patient recruiters…

…He believes that the files were not falsified, but he does not know what notes and material were put into the files after he saw them. He had no idea whether Dr. Gumer falsified reports in order to make it appear as though patients were properly admitted.

Similarly, he did not know if Dr. Gumer overmedicated patients to justify his psychiatric diagnosis and did not know if HP had a patient quota…

…Concerning his non-appearance at the grand jury, Hunter said that he invoked his Fifth Amendment rights and does not know specifically what his attorney advised the Government or other defense lawyers about that decision. Hunter said he would have disregarded his attorney's advice to not testify at Miller's trial and that one reason he did not testify at Miller's trial is that no defense attorney contacted him. However, he said he was not aware of whether Kallen-Zury's attorney, Pasano, was in contact with his attorney and did not know if his attorney advised Pasano that he would not testify at the Miller/Kallen-Zury trial. DE-59:78-83.(Emphasis added.)

## F.   Daisy Miller

The R&R found:

Miller was HP's clinical director, and Chris Gabel, the COO, was her direct supervisor. She said that Llano tried to lure her away, but she declined the opportunities because she was building a strong clinical team and because HP was more convenient for her personal life (e.g., she had two young daughters). She said she finally left HP in 2012, right after learning in a meeting with the Government that investigators and prosecutors alleged that fraud was occurring there. She contacted Llano the next day, and he offered her a position at High Point, another psychiatric facility…

…Miller said she worked for Llano at his High Point facility for less than three weeks, but was terminated after her arrest because her license to practice was compromised.

Miller said she qualified for court-appointed counsel and met Malone, who had been assigned to represent her, for the first time at her arraignment. She said she did not meet him again for several months. She said she prepared for the meeting and gave Malone a list of witnesses who could help with her defense and a written explanation of HP's relevant policies and procedures. According to Miller, Malone gave the impression that he would look into all of it.

Miller agreed to participate in a joint defense agreement and attended the joint defense meetings. Miller said she told Malone that she viewed the joint defense

meetings as focusing on Kallen-Zury. According to Miller, Malone's response to her stated concerns was the basic message of "we will get to it." Still, she said that she did work with Malone to prepare her defense. Miller said she allowed him to do his job --i.e., she deferred to his experience.

Nevertheless, Miller said that the joint defense theme was that if things went well for Kallen-Zury, then they would go well for the other defendants. She said that Malone agreed with the approach of "don't rock the boat." As explained by Miller, Malone said that all defendants would benefit if there was an acceptable explanation for the kickbacks and invoices.

Miller said she advised Malone about almost 30 potential witnesses and raised this witness issue with him every time she spoke with him. Miller said that Malone's consistent response was to say that he "would work on it."

Moreover, Miller said that she discussed with Malone her desire for her own expert witness, but that Malone advised her that there would be one expert witness because Kallen-Zury's attorney, Pasano, had retained one. Miller said Malone never gave her a copy of the report prepared by Pasano's expert and never spoke with her about the expert's conclusions. During the weekend before she testified, Miller said, Malone told her that the expert's testimony would be "great."[2]

Miller also explained that Malone never discussed with her his decision to not call any trial witnesses besides herself…

…On cross-examination, Miller conceded that Hunter, Sordellini, Dr. Piercey, and Llano were not listed on the 29-page, single-spaced memorandum she prepared for Malone and which she attached as an exhibit to her § 2255 habeas petition. [ECF No. 1-3]. She also admitted that Malone had sent an email to Roy Rindom (described earlier in this Report) on April 26, 2013, thanking him for his willingness to participate at trial and seeking the names of others. This contradicts Rindom's affidavit, where he says that no one ever contacted him about coming to testify for Miller at trial. Miller conceded that (1) Rindom left HP in 2007, (2) the charged conspiracy ended in 2012, (3) Rindom was not involved in the decisions to admit or discharge patients, (4) Rindom was not involved in meetings with Miller and Kallen-

---

[2]But Kallen-Zury's expert witness, Dr. Danziger, never testified.

Zury, and (5) Rindom did not have conversations with patient recruiters.

Miller conceded that Malone sent her a May 2, 2013 email, attaching Sandra Novak's memorandum, saying "good stuff." Miller said she was aware that Malone hired a private investigator to assist with the case. She also conceded that Dr. Piercey never worked at HP. And she also conceded that none of the emails she produced contain a complaint to Malone about not contacting a specific witness…

…On redirect, Miller said she did not understand that she would be tied in to the allegations about the contracts and invoices and finances. When she learned during trial that she would be tied to them, she told Malone that certain named witnesses could rebut the allegations. Miller said that Malone was not prepared to handle the allegations and evidence tying her to the invoices because Pasano was supposed to handle that issue.

According to Miller, Malone told her that witnesses would not be called because it would go against the joint defense theme. She did not think that Malone prepared an independent defense for her, and she believes that Malone did not call his own witnesses because he did not want to jeopardize the joint defense. Miller contended that Malone told her that he had three witnesses lined up to testify at the hearing: Parker, Rindom, and the expert witness retained by Pasano. Miller said she also gave Malone another witness list, besides the one attached to her habeas petition in this case, in the underlying criminal trial.[3]
DE-59:83-88.

## G.    Roy Rindom

The R&R found:

…Rindom worked with Miller at HP from 2004 until 2007 as a

---

[3]The Court took judicial notice of the list subject to its earlier fundamental ruling about uncalled witness:the Court would not consider them unless supported by an affdavit. DE-59:88. The list was filed in the underlying criminal trial, as an exhibit to the "Supplemental Points and Authorities in Support of Defendant Daisy Miller's Supplemental Motion for New Trial Pursuant to Rule 33." [CRDE No. 512-1] It lists 31 witnesses, in alphabetical order . For some of the witnesses, Miller also wrote comparatively lengthy background summaries about the witness and how he or she might be helpful. For others, she did little more than list their name and title. DE-59:88.

psychotherapist. He described Miller as "a uniquely very talented manger" who is "truly naturally gifted in the art of connecting with every level of person." He said that "to this day I am still in awe of her managerial people skills" and classified her as a "million dollar manager."

According to Rindom, Miller was a by-the-book employee who did not participate in any "shenanigans pertaining to the discharge, admittance or treatment of patients." He said that Miller never asked him to do anything unethical or unlawful. However, he also noted that he was not involved with Medicare or "any monies" while working at HP. Rindom's affidavit also says that (1) Miller never told him to write negative comments in any patient files, (2) Miller never told him what to write in clinical notes, and (3) Miller would ensure that appropriate clinical information was included in the notes but never gave direction on what or how to write the patient notes. Rindom said he would have testified at trial, but no one contacted him about being a trial witness…

DE-59:38-39; DE-21-6

## H.    Sandra Novack

The R&R found:

A therapist who worked mostly with mental trauma, Novak said she decided to work at HP because of Miller and her work ethic. Her declaration does not mention the years during which she worked at HP. Novak said that Miller was always census conscious and would often allow employees to go home according to the patient population. She said she had no respect for Dr. Gumer, noting that he would show up to work with holes in his jeans and shoes and often "worked the situation" regarding patients. Novak said she told the FBI during an interview at her home that she was unaware of any fraud at HP. She said the FBI agents tried to intimidate her. Novak said she was not contacted to be a trial witness but would have agreed to it.

DE-59:39-40; DE-21-4

## I.    Michael Calabria

The R&R found:

15

A psychotherapist who worked at HP on the weekends and whenever Miller contacted him to conduct interviews or run a group session, Calabria described the quality of care as "very good" and explained that Dr. Gumer and other doctors were responsible for admitting and discharging patients. His affidavit did not pinpoint the years when he worked at HP, though he says he still works at the facility (which is now called Larkin).

He said that neither Miller nor anyone else at HP ever told him to write anything specific in the patient charts. In addition, he knows Marci Kagan and is friendly with both Kagan and Miller and understands how Kagan could have become angry with Miller. His declaration also says that he does not understand how Kagan could have correctly said that Miller dictated to Dr. Gumer. Calabria had been to Miller's home and could confirm that he knew of nothing to suggest that she lived a lavish lifestyle. Calabria was not contacted to testify at the initial trial but would be available for a subsequent trial.
DE-59:40; DE-21-1.

## J.    Karen Bryan

The R&R found:

A mental health technician who worked at HP from 2006 through 2013…She did not have much interaction with Miller but described her as an amazing person. She did not know anything about billing but confirmed that the doctor was the only person who could admit or discharge patients. No one contacted her about the trial but she would be available for a subsequent trial.
DE-59:40; DE-21-9.

## K.    Dr. Danziger

The R&R found:

Dr. Danziger testified that he was retained to review 36 files encompassing multiple admissions of a cross-section of 19 patients. He was to review these files for appropriateness of admission, treatment, length of stay, and discharge plans. He was also to focus on the file entries themselves to determine whether, in his opinion, there was evidence of falsification of entries in the files, an allegation raised by the

16

Government. He explained in detail how a person qualifies for Medicare coverage, either as a function of age or disability, and how these applied to the situation at Hollywood Pavilion.

He testified that all the patient files he reviewed, which consisted of 36 different hospital admissions of 19 different patients over a number of years, reflected proper admissions to a psychiatric hospital under well-established medical criteria. The diagnoses varied from patient to patient, and sometimes from admission to admission, but all patients were sick and all needed to be in the hospital.

Most or all of the patients were "dual-diagnosis," meaning that they suffered from both a psychiatric condition and a substance abuse problem, but the dual-diagnosis did not affect the propriety of their hospital admission. He also testified that, while any doctor may have falsified any particular entry in any chart, his review of the charts showed a consistency throughout all the entries that undermined the Government's allegation that the files were falsified in order to bilk Medicare. Nurses, social workers, group therapy leaders, etc., up to 18 different people per file, made entries, all of which were consistent with the diagnosis, treatment, and discharge of the patients.

Dr. Danziger then testified about the contents of several files, encompassing multiple admissions of two specific patients, D.S. and S.M. These were the patients named in Counts 7 and 8 of the indictment -- the ones whose files Pasano and Malone did not provide to the United States until the night before a mid-trial notice of an intent to call him as an expert witness. He went through each admission, treatment, and discharge of both patients, over several years, and testified that on each occasion, the patient was properly admitted, properly treated, and properly discharged.

He confirmed that, in every situation, the doctor (not a nurse, an admissions officer nor Miller) made the decision to admit or discharge a patient. Dr. Danziger testified that signed but blank patient treatment plans were not necessarily evidence of either improper treatment of the patients or an attempt to defraud Medicare. He explained and tried to distinguish the testimony of the Government's medical expert, Dr. Triplet. He opined that Dr. Triplet's testimony did not address the heart of the issue, that is, whether the patients admitted to Hollywood Pavilion were properly admitted, treated, and discharged. Rather, he expressed his view that Dr. Triplet's testimony was limited to an analysis of bare admissions statistics.

17

Dr. Danziger confirmed that he has no memory of ever speaking with Malone. Most of his communication was with Aaron Danzig, one of Kallen-Zury's attorneys. In fact, it was attorney Danzig who helped him prepare for testimony. He had a vague recollection of speaking with Kallen-Zury's trial counsel, Pasano. He was never told why he was not called to testify, nor did he travel to Miami for the trial, as he was never told by any trial counsel to do so.

On the other hand, Dr. Danziger also conceded that he did not interview any patients or doctors and never visited HP. Rather, he based his opinion only on his review of patient files. According to his review of the records, Dr. Danziger opined that all of the charts he reviewed justified admission into HP. Dr. Danziger testified that he presented his findings to Kallen-Zury's defense team and that he was available to testify at trial.

According to Danziger, it was unlikely that the charts he reviewed were fabricated because the entries were made by multiple practitioners, and it was "difficult to imagine" that all the practitioners fabricated notes.

Danziger conceded that "if there was deliberate training [of] people to write false records, yes, that could produce an altered chart" and testified repeatedly that he could not determine whether the notes he reviewed were truthful or not. Dr. Danziger also acknowledged that he reviewed charts for only 19 patients, even though hundreds of patients were admitted into HP. Dr. Danziger was also shown blank treatment forms signed by psychiatrists at HP and testified: "You shouldn't sign a blank form. I'm not going to deny the obvious."

**Government's Witness:**

**L.    T. Omar Malone**

The R&R found:

…Malone explained, in detail, that strategic reasons drove his decision to not call other witnesses. On balance, he determined that the risks outweighed the potential benefits. Even though the witnesses might have testified favorably about Miller, he was concerned that the Government prosecutors would then get to rehash

and repeat all the negative evidence during cross-examination…

…Malone did not receive a file from any former attorney representing Miller after he was appointed as her CJA attorney. He recalls that the patient files were kept in a government warehouse, stacked floor to ceiling. Pursuant to a court-approved budget, Malone hired a private investigator. Malone said he tasked the investigator with obtaining witness statements and with obtaining documents from an investigator hired by Kallen-Zury's counsel. Malone said that his investigator worked under his direction, not under the direction of Pasano or other lawyers in the joint defense agreement.

Malone said he was in contact with the investigator on an almost-weekly basis. The investigator interviewed witnesses and sometimes wrote interview reports, which were sent to him.

Malone explained that he was in contact with the other defense attorneys two to three times per week and attended meetings on an almost-weekly basis. Some meetings were with only attorneys, and some were also with the clients. The joint defense agreement and the meetings were designed to leverage other lawyers' knowledge and to pool resources. For example, Malone noted, other lawyers hired their own private investigator, but he benefited from that investigator's work. To provide one illustration, the other investigator would give his investigator contact information about potential witnesses, and the investigators would exchange interview memoranda.

Malone explained that his defense of Miller was not focused on Kallen-Zury. His strategy was to portray Miller as an upstanding citizen who took her work seriously and who was unaware of certain events occurring at HP. He said he developed this approach and strategy in consultation with Miller, who, he said, understood it.

Malone said that Miller was diligent in providing him with the names of potential witnesses and said, "to this day, [she is] one of my best clients ever."

Malone mentioned Sandra Novak and Veronica Sheehy as examples of potential witnesses who were interviewed and whose interview memoranda were shared among the joint defense team attorneys.

Malone said that he contacted four or five possible witnesses himself directly, while his investigator contacted others. He identified an email he sent to his investigator, listing the names of several potential witnesses, but he cannot specifically recall if he or the investigator ever made contact with them.

As the trial unfolded, Malone said, he considered whether to call other potential witnesses. He predicted that Miller would be an effective witness, but he became more concerned about what would happen with other witnesses. For example, Malone explained, a witness would "say good things" about Miller -- but then the Government would cross-examine them with evidence detrimental to her position. Malone said he discussed with Miller, both individually and jointly among the defense team, his concern about using other defense witnesses…

…Malone said he made the final decision to not call other witnesses, including her husband, after Miller testified.

Malone's testimony about his strategic reasons for not calling other witnesses applied to all the witnesses he was asked about (Hunter, Llano, Dr. Piercey, Smith, Sordellini, Michael Calabria, Rindom, and Novak). For the most part, he did not have any specific, independent reasons for not calling them as trial witnesses, other than the overarching reasons outlined above.

In addition, Malone said that Hunter was represented by counsel, which meant that he could not directly contact Hunter. He said it was "clear" that Hunter's attorney would not allow him to testify at trial.

Concerning Dr. Danziger, Malone testified that Pasano decided during trial to not use him as a trial witness. He considered using Dr. Danziger himself and interviewed him after Pasano made his last-minute decision to not call the doctor. After speaking with Dr. Danziger on the telephone, Malone said, he decided to not call him as a trial witness. Although Dr. Danziger might have been an effective witness concerning the limited records he reviewed, Malone explained that the expert reviewed less than 50 files out of thousands of files[2].

---

[2] This reinforces Malone's lack of a reasonable investigation. At any time he could have asked the expert to review more files or petitioned the Court for funds to have an expert review a statistically significant number of files.

In addition, Dr. Danziger would not have been able to adequately explain why HP was admitting out-of-state patients. In fact, Dr. Danziger told him, "that's a problem." If Dr. Danziger conceded to the jury that patients had several options in their own states, then the jury could conclude that the only reason the patients were agreeing to travel to an out-of-state hospital is that they were getting paid to be admitted. This, Malone said, fed directly into the Government's narrative.

Moreover, Malone said he was worried that Dr. Danziger could be cross-examined about Dr. Gumer, who testified that the patient treatment records were a sham. Thus, Malone explained, if the information in the patients' files was false, then Dr. Danziger's opinion about the files would be flawed.

Malone said he made his own, independent decision to not use Dr. Danziger as a trial expert…

…Malone never met or spoke with Hunter before trial, so he is not sure what Hunter could have testified about at trial. However, Malone said he was not allowed to speak directly with Hunter, who was represented by counsel. Malone also said that he never spoke directly with Hunter's counsel, Myles Malman, but was in the room when others spoke to Malman. Malone thinks that Pasano's investigator prepared a memorandum about what he was told that Hunter would testify about, but Malone said he never saw the memorandum. He said that Hunter's status as a potential trial witness was mentioned at one of the joint defense meetings...

…But Hunter was not a focus of Malone's trial preparation because Hunter was not available as a witness…If Hunter had, for some reason, become available, then he would have investigated further to see what he could have said to help Miller at trial.

Malone thinks he submitted a budget to the Court before trial as a CJA attorney and agreed that he could have submitted a supplemental request for more costs if the need arose…

…Malone said his main trial strategy was to present Miller as a dedicated professional who provided good patient care. He said his other strategy was to limit negative, detrimental information -- a goal partially accomplished by not allowing the prosecutors to repeat their evidence with negative cross-examination of defense

21

witnesses.

Before trial, Malone said, he had some feel for what the patient recruiters would say, and he was not concerned that they would say that Miller was involved in the kickback scheme. He said he was aware that the recruiters would testify that Miller knew about the payments. He said he had no evidence available or prepared to rebut those allegations.

Malone said he expected Dr. Gumer to testify that the patient records were falsified but does not recall if he also knew before trial that Dr. Gumer would also say that Miller ordered him to falsify files or to encourage his use of serious symptoms to stress the negative.

Malone said that he had other witnesses available at trial other than Miller herself. He said that he knew there were other witnesses who could rebut testimony that Miller ordered falsification of records or was aware of kickbacks, but he cannot recall the specific identities of those witnesses. Malone said that Miller herself was the best advocate and conduit for the rebuttal.

Malone said that his decision to call no witnesses other than Miller was made during trial, but that he had his investigator prepare witness subpoenas in case they were needed.

For most of the witnesses who signed affidavits for this habeas petition, Malone said, he had witness interview memoranda from either his own investigator or from other investigators, but he did not "pre-try" these witnesses…

…Malone said he "stacked" the witness list he submitted before trial and was not surprised that Hunter was on the list. Malone said that including someone on the list does not reflect a genuine intent to actually use that person as a trial witness; it merely preserves his ability to do so if he later decides to use that person as a trial witness.

Concerning Dr. Danziger, Malone said he did not recall if the doctor prepared reports, but he asked the doctor about the files he reviewed when they spoke on the telephone during a mid-trial Saturday conversation. Malone said he never sent Dr. Danziger any patient files and did not ask other attorneys to send Dr. Danziger

specific patient files.

Although Malone said he received informal updates that Dr. Danziger would be a good witness, he did not see how Dr. Danziger could rebut Dr. Gumer's testimony that he falsified the records. At best, Malone said, all Dr. Danziger could say is that he saw no evidence of malingering in these files. Malone said that Dr. Danziger told him, "I can't tell you whether what [is] in the record is accurate."…

…Malone said he made his own decision to not call Dr. Danziger. Malone did not remember if he considered retaining his own independent expert (besides Dr. Danziger, who was retained by Pasano).

…Malone said he decided to not use Dr. Danziger as a trial witness before Miller finished her testimony. Malone said that Miller presented herself to the jury in a professional, succinct way. In his view, she was truthful and accurate and gave appropriate responses to the Government's cross-examination questions. DE-59:89-98.

## A. **Standard of Review**

In an appeal involving the denial of a motion to vacate pursuant to 28 U.S.C.

§ 2255, the Court reviews legal conclusions *de novo* and findings of fact for clear

error. *Thomas v. United States,* 572 F.3d 1300, 1303 (11th Cir.2009).

## SUMMARY OF THE ARGUMENT

Miller was a diligent client who supplied counsel with lists of witnesses and

comments about their potential assistance. Counsel learned that the government had

thousands of patient files from HP and that the thrust of the prosecution against

Miller centered upon testimony that most patients were fraudulently admitted to HP.

With the evidence known to counsel, any reasonable attorney would have

investigated further by retaining or consulting a medical expert to review the patient files to see if patients were improperly admitted.   However, counsel failed to hire a medical expert to review files, despite having funds available pursuant to the Criminal Justice Act.  Counsel completely abrogated this task to the co-defendant's counsel and only spoke to the medical expert until after the government rested its case and after Kallen-Zury's counsel decided not to use him.  The medical expert did not recall any conversation.  After this brief and undocumented conversation counsel had no idea (or the wrong idea) what the medical expert would say. Counsel was unaware that the files for the only two patients named in the Indictment had not been turned over to the government, so the Court was inclined to exclude the expert from testifying that those two patients were properly admitted to the hospital.

 Also, counsel failed to conduct a substantial and thorough investigation of the witnesses Miller suggested.  Counsel or his investigator did not contact most of the potential witnesses.  Although they did speak with a few witnesses any conversation, they had was minimal. As a result, counsel had no idea what any of the witnesses would say if called at trial.

Counsel decided not to call any witnesses other than Miller because he did not conduct a reasonable investigation based on evidence known to him. Thus, his decision was uninformed and not entitled to any deference.  The court erroneously

24

gave counsel's tactical decision deference by applying the wrong legal standard to the performance prong of the *Strickland* analysis.

Miller was prejudiced by counsel's ineffectiveness because counsel did not present expert and fact witnesses to the jury that would have refuted the government's theory of the case that over 99% of the patients were fraudulently admitted to HP. Additionally, some of these fact witnesses would have refuted the government's purported motive for Miller to commit the crime (simply to keep her job) by testifying that Miller had other legitimate job offers during this time.

## ARGUMENT AND CITATIONS OF AUTHORITY

### I. COUNSEL'S FAILURE TO CALL ANY TRIAL WITNESSES WAS AN UNINFORMED DECISION WHICH CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL

**a. <u>The Court's Ruling</u>**

The R&R found that Miller had not adequately demonstrated that Malone's purported inadequacies reached constitutional invalidity and even if they did, Miller did not establish the requisite prejudice. DE-59:3-4. After a *de novo* review, the Court overruled both the government's and Miller's objections to the R&R by stating that the report was thorough, exhaustive, and persuasive, and sufficiently addresses why the parties' objections lack merit and denied Miller's motion for post-conviction relief. DE-72:2

### b.    <u>The Legal Standard</u>

To prevail on an ineffective assistance of counsel claim, Miller must establish: (1) deficient performance -- that her counsel's representation fell below an objective standard of reasonableness; and (2) prejudice – that, but for the deficiency in representation, there is a reasonable probability that the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 691 (1984); *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000). For the reasons argued *infra*, Miller proved that her trial counsel's performance was constitutionally deficient and that, but for the deficient performance, there is a reasonable probability that the jury verdict would have been different.

### c.    <u>The Government's Theory of the Case</u>

The government began their opening statement by arguing that Miller's motive to commit the crime was simply to keep her job:

"Now, the evidence will show that Karen Kallen-Zury made millions upon millions of dollars, but these other defendants, they did not. But in order to keep their jobs, their titles, their salary, and their status, they all agreed to help her". CR DE-289-21.

The Government then made clear their theory of the case against Miller in their opening statement on May 22, 2013:

"The defendant, Daisy Miller, was the director of HP's inpatient program, the inpatient psychiatric ward. She ran it, she was in charge. **Her job was to fill the**

**hospital and the beds with patients, Medicare patients, patients who didn't need to be there, patients who weren't qualified to be there, patients who, the evidence will show, Daisy Miller helped pay bribes to get".**
CR DE-289:23-24. (Emphasis added.)

The government stated how they would prove their case with witnesses and documents (CR DE-289:32) and specifically mentioned Dr. Gumer:

"You will even hear from the former medical director at HP, the head doctor himself, the man who was in on the criminal fraud conspiracy. **The man who fraudulently admitted patients, who kept patients in the hospital when they didn't need to be there, who over-medicated patients with psychotropic medications.** And who discharged patients simply because their Medicare benefits were running out. He will testify, he will take that stand, and he will tell you exactly what he did and who he did it with".
CR DE-289:34. (Emphasis added.)

Unfortunately, Malone was ill-prepared to rebut the government's line of attack:

THE COURT: So the question would be, Mr. Malone, once you heard the evidence at trial from Dr. Gumer that Daisy instructed him or encouraged him to make false entries, would you have any witnesses available who would rebut that testimony?

…

THE WITNESS: I did. I have Daisy Miller. Other than Daisy, no.
DE-58 200-201.

Counsel was appointed on November 2, 2012. CRDE-68. If it was not clear to trial counsel after over seven months of pre-trial preparation, after opening statement it was abundantly clear that any documents or witnesses (other than

27

Miller) tending to show that patients were not fraudulently admitted to the hospital were critical to Miller's defense.  Counsel had another 26 days until Miller's defense case began.  CRDE-352. For the reasons argued *infra*, counsel's failure to investigate whether patients were fraudulently admitted to the hospital both pre-trial and during trial led to an uniformed decision on whether to call witnesses at trial.

### d.    <u>Counsel's Performance Was Constitutionally Deficient</u>

### 1.    The Court Used The Wrong Legal Standard In Assessing The Performance Prong Of *Strickland*

Since counsel did not conduct a substantial and thorough investigation, the R&R applied the wrong legal standard in assessing the performance prong of *Strickland*.  The R&R concluded:

> Trial counsel's decisions, particularly about whether to call certain witness and introduce documents, are entitled to great deference, and there is a presumption that trial counsel's decisions are reasonable. *Chandler*, 218 F.3d at 1313; *Chateloin v. Singletary*, 89 F.3d 749, 752 (11th Cir. 1996). And if trial counsel's decisions are the result of substantial and thorough investigation, they are virtually "unchallengeable." *Strickland*, 466 U.S. at 690-91 ("Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").
> DE-59:99

Instead, the Court should have employed Miller's analysis.  Miller argued that:

> Trial counsel's strategic decisions cannot be entitled to deference because they were not informed strategic decisions. See *Wiggins v. Smith*, 539 U.S. 510, 521-

523 (2003) (explaining that the "virtually unchallengeable" deference given to strategic decisions made after thorough investigation of law and facts relevant to plausible options is inapplicable to strategic choices made "after less than complete investigation") (quoting *Strickland*, 104 S. Ct. at 2052); see also *Williams v. Taylor*, 120 S. Ct. 1495, 1515 (2000) (finding counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to instead focus on defendant's voluntary confessions, because counsel had not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background"). Thus, the inquiry here should include an analysis of whether the investigation "was itself reasonable." *Wiggins*, 539 U.S. at 523. DE-59:102-103.

Had the Court used the proper standard for the performance prong of *Strickland*, Miller would have prevailed as the record supports the conclusion that counsel's investigation was incomplete.

## 2.   Counsel's Investigation was Incomplete

Counsel's knowledge that the government possessed patient files triggered an obligation to conduct a substantial and thorough investigation. Simply going to the government's warehouse and reviewing some patient files does not suffice as a reasonable investigation[3]. Especially since Miller provided counsel with leads that needed to be investigated. In *Wiggins*, counsel became aware of his client's life history by reviewing DSS records yet, despite this knowledge, did not pursue these leads and decided not to call witnesses in his mitigation case. The Supreme Court reversed the conviction holding:

---

[3] Although Malone never identified what patient files, if any, he reviewed.

As the Federal District Court emphasized, any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background.
*Wiggins*, 539 U.S. at 525.

It is clear that a lawyer has a duty to investigate witnesses known to him:

It is well-established that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691. The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'" *Kimmelman v. Morrison,* 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (quoting *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052). This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence. *See Bryant v. Scott,* 28 F.3d 1411, 1419 (5th Cir.1994) (citing *Henderson v. Sargent,* 926 F.2d 706, 711 (8th Cir.1991)). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega,* 528 U.S. 470, 481, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000); *accord Clinkscale v. Carter,* 375 F.3d 430, 443 (6th Cir. 2004). A purportedly strategic decision is not objectively reasonable "when the attorney has failed to investigate his options and make a reasonable choice between them." *Horton v. Zant,* 941 F.2d 1449, 1462 (11th Cir.1991) (cited in *Combs v. Coyle,* 205 F.3d 269, 288).
*Towns v. Smith*, 395 F. 3d 251, 258 (6th Cir. 2005)

The 11th Circuit and multiple other Circuits have reversed convictions on numerous occasions holding that the failure to adequately investigate defenses and present evidence is ineffective[4].

---

[4] *Cooper v. Secretary, Dept. of Corrections*, 646 F.3d 1328 (11th Cir. 2011)(failure to investigate potential

Courts have found that no deference is owed to counsel's tactical decisions in these situations:

the "'failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness.' Although they remain mindful that 'the range of reasonable professional judgments is wide,' courts recognize that 'ineffectiveness is generally clear in the context of a complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when [he] has not yet obtained the facts on which such a decision could be made.' Strickland simply 'does not require…deference to decisions that are uninformed by an adequate investigation into the controlling facts and law.'" *Anderson v. Johnson*, 338 F.3d 382, 392 (5th Cir. 2003); quoting *United States v. Gray*, 878 F.2d 702,711 (3d Cir. 1989)

Miller was the Clinical Director of HP who managed the day-to-day treatment of the patients, the work of the therapists, and oversaw some of the treatment-side employees. The government alleged that she furthered the conspiracy to defraud

---

circumstances in mitigation and to present such evidence ineffective); *Johnson v. Secretary, Dept. of Corrections*, 643 F.3d 947(11th Cir. 2011)(failure to investigate potential circumstances in mitigation and to present such evidence ineffective)*Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011)(failure to investigate potential circumstances in mitigation and to present such evidence ineffective); *Sussman v. Jenkins*, 636 F.3d 329 (7th Cir. 2011)(failure in child pornography and sexual abuse of a minor case to adequately investigate and present evidence of minor victim's prior false claim against father during divorce proceedings);*Couch v. Booker*, 632 F.3d 241 (6th Cir. 2011): counsel ineffective in second-degree murder case for failing to investigate a "causation" defense regarding cause of death and failure to present an expert);*Foster v. Wolfenbarger*, 687 F.3d 702 (6th Cir. 2012)(counsel ineffective in second-degree murder case for failing to investigate and present an alibi defense);*McClellan v. Rapelje*, 703 F.3d 344 (6th Cir. 2013)(counsel ineffective for failing to interview witnesses and have them testify);*Cannedy v. Adams*, 706 F.3d 1148 (9th Cir. 2013)(counsel ineffective for failing to present witnesses who supported defendant's testimony); *English v. Romanowski*, 602 F.3d 714 (6th Cir. 2010)(counsel ineffective for failing to adequately investigate witnesses and for promising evidence in opening that was never presented); *Bigelow v. Haviland*, 576 F.3d 284, rehearing denied, 582 F.3d 670 (6th Cir. 2009)(counsel ineffective for failure to adequately investigate and present alibi witnesses); *Duncan v. Ornoski*, 528 F.3d 1222 (9th Cir. 2008); *Bell v. Miller*, 500 F.3d 149 (2d Cir. 2007)(counsel ineffective for failing to consult an expert.); *Ramonez v. Berghuis*, 490 F.3d 482 (6th Cir. 2007)(counsel ineffective for failure to interview and present witnesses that supported defendant's testimony.); *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007): counsel ineffective for failing to prepare to cross-examine government witnesses);*Goodman v. Betrand*, 467 F.3d 1022 (6th Cir. 2006)(counsel sat idle and decided to let government make his case for him.)

31

Medicare by forcing psychiatrists to admit patients who did not meet criteria, ordering personnel to falsify medical files, keeping patients for as long as (and *only* for as long as) they had Medicare coverage available, and mistreating patients with an utter disregard for their safety or well-being. She is alleged to have done all this to "keep her job." However, almost all of the evidence the government introduced against Miller was testimonial. Therefore, trial counsel needed to do a reasonable investigation into the existence of evidence (potential documents and witnesses) that could contradict that testimony. Notably, there was not one patient file of HP's that was introduced at trial by the government to support Dr. Gumer's assertions and the government's theory of the case.

The R&R notes that Malone spent approximately 1,200 hours defending Miller and argues that there is nothing about that level of preparation to presumptively signify ineffectiveness. DE-59:100-101. The R&R does not explain how those 1,200 hours were spent and whether they led to Malone conducting a reasonable investigation to rebut the central theme of the government's case-that over 99% of the patients were improperly admitted.

Additionally, the fact that Malone spent approximately 1,200 hours defending Miller or had some rudimentary knowledge of the patients' files does not mean his investigation was reasonable. Rather, the analysis of whether the investigation was

reasonable should have continued and focused on what counsel did, if anything, with that knowledge. Whatever knowledge Malone had about the government's allegations, he did not conduct the necessary investigation to rebut those allegations.

A starting point would have been to review the government's discovery to see if it contained the patient files of S.M. and D.S., the **only** two patients named in the Indictment. Approximately one month into the trial it was clear counsel had not taken that step:

MALONE: I had no idea that the Government did not possess these files. They were certainly a part of the indictment. They had a warehouse full of patient files out in Miramar that we spent days and days going through. **I had no idea they didn't have these two files.** And, in fact, had every reason to believe they had them since they were a part of their indictment and a substantive charge in this indictment. CRDE382:9.(Emphasis added.)

Other than the fact that counsel had knowledge that some patient files existed because he allegedly "spent days and days going through" them, the record is clear that he did not take reasonable steps to further investigate the patient files to see if the patients were properly admitted to the hospital. Crucially, he did not choose to hire a medical expert to investigate Dr. Gumer's claims, nor did he speak to Kallen-Zury's expert until Miller's defense case began[7]. The Supreme Court has held that

---

[7]Dr. Danziger testified that the name "Mr. Malone" does not ring a bell in response to a question about speaking to the other defendants' counsels. DE31-1:50. Furthermore, as Miller noted in her objections to the R&R, Malone did not even know the details of what Dr. Danziger would testify to, other than "best practices" which Malone did not attempt to define. DE-61:6-7.

the proper analysis is:

In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming [counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a **cursory investigation automatically justifies a tactical decision with respect to sentencing strategy**. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy. *Wiggins*, 539 U.S. at 527 citing *Strickland*, 466 U. S., at 691. (Emphasis added.)

Furthermore, the factual findings made by the lower court supports Miller's position that counsel's investigation of Miller's case was incomplete and unreasonable given the nature and complexity of the case.

For example, the Court found in its R&R that:

Malone's recollection of his investigation is less than comprehensive. He recalls speaking with some witnesses but cannot pinpoint which ones. He recalls that his investigator spoke with several witnesses but is not certain about their identities. He remembers that Kallen-Zury's investigator interviewed other witnesses, and he believes that he benefitted from those interviews through the receipt of copies or discussion at joint defense meetings. But, again, he cannot precisely target which witness falls into which category.
DE-59:103

Counsel's investigation is also incomplete when one considers the information that Miller supplied.  Miller supplied counsel with dozens of potential witnesses and details on each, including all the witnesses that testified or submitted affidavits herein except for Karen Bryan.    DE-1-3; CRDE512-1.    The

reasonableness of an attorney's performance "(including what investigations are reasonable) depends 'critically' upon 'information supplied by the [petitioner],' . . . evidence of a petitioner's statements and acts in dealing with counsel is highly relevant to ineffective assistance claims." *Chandler*, 218 F.3d at 1318 (quoting *Strickland*, 104 S. Ct. at 2066).   Drawing a sharp contrast to trial counsel's lack of recollection about his investigation, the Court also found in its R&R that:

> There is little doubt that Miller proved to be a diligent client who supplied Malone with comprehensive memoranda, including detailed lists of witnesses and comments about their likely assistance. It is also clear that Malone and his investigator did not contact all of the witnesses before trial, though they did speak with several and learned about some of the witnesses' likely testimony indirectly. DE-59:104

These memoranda from Mrs. Miller, had they been properly investigated, would have focused Malone on the fact that there were several witnesses that were available to be called to rebut Dr. Gumer's testimony that over 99% of the patients were fraudulently admitted including evidence in the form of patient charts to bolster Daisy Miller's defense.  A reasonable investigation would have allowed counsel to make an informed decision as to whether to call witnesses to rebut those allegations or to simply rest on his client's denials.

The Court erred in finding counsel was not ineffective by overruling Miller's objections to the R&R and not making further specific factual findings with respect

to Malone's performance.  Notably, there is no finding in the R&R that Malone

properly investigated the central theme of the case-whether patients were properly

admitted to HP for inpatient treatment.

## A.    Dr. Danziger or a Medical Expert

The R&R's justified the failure to call Dr. Danziger as follows:

It is difficult for Miller to convincingly and successfully pursue the argument
that Malone was ineffective for not calling any trial witnesses besides herself when
Pasano, a skilled and experienced attorney, made the same exact strategic decision.
There is ample evidence supporting the strategic decision to not call other witnesses,
including Dr. Danziger. In fact, although some attorneys might have called Dr.
Danziger, the decision to not call him was understandable and rational.   Dr.
Danziger's testimony would have been subject to rigorous cross-examination, and
that cross-examination likely would have revealed that (1) Dr. Danziger reviewed
only a small portion of the patient files, (2) he had nothing substantive to offer about
the hundreds of other patients who were at issue in HP's Medicare billing, (3) he
could not tell whether the medical files he reviewed had been falsified, and (4) he
had no satisfactory approach to explain away the out-of-state patients admitted to
HP.
DE-59:99-100[5].

The R&R's conclusion here is erroneous for several reasons.  A comparison

to Kallen-Zury's counsel's decision not to call Dr. Danziger is irrelevant.

First, Kallen-Zury was involved in the financial and operational side of HP

and it was not the government's theory that Kallen-Zury was involved in patient

care.   The  government's  argument  that  almost  all  the  patients  were  being

---

[5] Again, this speaks to Malone's failure to recognize the issues, failure to consult and direct Danziger or his own
expert, and failure to investigate a meaningful defense.

fraudulently admitted went to the patient care side of HP, not the financial side. Therefore, while it might have made sense for Pasano not to call him, that rationale does not apply to Malone.

Second, Kallen-Zury's counsel spoke to Dr. Danziger and was familiar with his testimony in order to make a strategic decision on whether to call him. As Miller noted in her objections, the R&R failed to consider that this was Pasano's witness, Malone had no conversations with Dr. Danziger until four weeks into trial, had no idea Dr. Danziger prepared reports, had no involvement in suggesting what files Dr. Danziger should review, and although he heard Dr. Danziger would be a "good witness" he did not know what his testimony would be other than the files were kept according to "best practices". DE-61:6,7; DE31-1:66; DE-58:212-215, 220-221. In reality, Dr. Danziger would have testified that based on his review of the files, there was nothing to indicate the file entries had been falsified or exaggerated to justify admission and treatment of patients. . *Id.*

Furthermore, had trial counsel consulted with Dr. Danziger prior to trial or asked the court to appoint a medical expert under the CJA, he could have effectively neutralized two of the rationales the R&R gave for not calling him: that (1) Dr. Danziger reviewed only a small portion of the patient files and (2) he had nothing substantive to offer about the hundreds of other patients who were at issue in HP's

Medicare billing.  DE-59:99.

Counsel could have directed Dr. Danziger or another medical expert to review all or a statistically significant percentage of the patients' files in discovery.  In *Wiggins*, like here, the defendant was indigent and counsel had the ability to request state funds to hire an expert.  *Wiggins*, 539 U.S. at 517.  The R&R's third concern, that Danziger could not tell whether the medical files he reviewed had been falsified should have been considered in context with the other proposed fact witnesses such as Smith and Sordellini, who after reviewing hundreds of files, never noticed any entries in the medical records that were inconsistent with the patients they were treating.  Furthermore, Dr. Danziger testified that he could in fact tell whether the medical files were falsified:

I understand that part of the allegations here was that there is false documentation, but what I tried to look at here was, are the charts consistent across disciplines?... In other words, my analysis was -- and I think I said this on direct -- I understand any one doctor could write a note that someone is sicker than they are, needs to be in the hospital when they don't. But it would stretch credibility that 15 or 18 people writing in the chart, therapists with a Master's degree, licensed clinical social workers, three shifts of nurses, psychiatric technicians, that all of these people would be, in essence, in on it.
*United States v. Kallen-Zury,* Case 1:17-cv-21269-JEM (SDFL) DE-54:59.

Finally, the Court's fourth concern - that Dr. Danziger could not explain why out-of-state patients were being brought to HP - could have been rebutted. Dr. Danziger or a similar medical expert could have contradicted the underlying

government narrative that these "out of state" patients were simply drug abusers and were not eligible for Medicare reimbursement.  Dr. Danziger testified that:

> ...treating psychiatric patients is not that simple, it's more complex. And what we see is the concept of comorbidity. Patients are comorbid, they have more than one diagnosis. And one of the greatest risks for a substance use disorder is a psychiatric illness.

*Id.* at DE-54:25.

Had the Court sustained Miller's objection and considered those facts it should have found that counsel's decision not to call Dr. Danziger was an uninformed one.  A thorough investigation required a medical expert to review patient files in advance to see if an opinion could be rendered on whether the files appeared to have been falsified and whether patients were properly admitted.  Since counsel did not do this it is not surprising that he had no idea that Dr. Danziger's testimony would have rebutted Dr. Gumer's claims that records were falsified. Thus, the decision not to call Dr. Danziger (or his own medical expert) as a witness was not a strategic one, it was a uniformed one.

## B.    Fact Witnesses

Despite Miller's efforts to highlight these witnesses who would have rebutted Dr. Gumer's testimony, counsel's investigation into their potential testimony was at worst, non-existent or at best, incomplete.  The R&R found:

Malone said he thinks he personally spoke to Llano; does not recall who Dr.

Piercey is; does not recall either way if he spoke with Robin Smith; recalls speaking to Sordellini but does not recall the specifics; thinks his investigator spoke with Sordellini and prepared a detailed report; and has no specific recollection now about what those witnesses might have said if they testified. Malone said his decision to not call them (or any other witness) was based on his general concern over cross-examination.
DE-59:97.

### i.    **Melvin Hunter, Michael Calabria and Robin Smith**

Although Miller provided Malone with details of what Hunter would testify to (See CRDE-512-1:4), Malone had no idea what he would say and did not know if an investigative memo on his testimony existed because he never saw it.  DE-58:186-7.  Miller also provided details on Calabria (CRDE-512-1:3), Dr. Michael Piercey (*Id.* at 9),(Llano is mentioned with Piercey), Robin Smith (*Id.* at 11-12), but Malone never spoke to Hunter, Calabria, Piercey and Smith and had no idea what they would say.  DE-58:204-206.

### ii.    **Rita Sordellini and Roy Rindom**

Other than almost identical April 26, 2013 emails to Sordellini (DE1-3:33) and Rindom (DE1-3:34) it does not appear that counsel had any other contact with them.  Miller specifically thought Rindom was a "must" witness.  (CRDE-512-1:9).  Dale Miller also provided counsel with information about Rindom a couple of months prior to trial discussing how he could be important on the Dr. Gumer issues.  (DE-1-3:72-74).  Malone testified he had a short conversation with Sordellini but

does not remember the nature of the conversation and had no idea what either Rindom or Sordellini would testify to.  DE-58-204-206.

### iii.  Manuel Llano and Dr. Michael Piercey

Malone remembers speaking to Llano, although Llano testified he never spoke to Malone or his investigator.   DE-59:74; DE-58-204-206.  Malone had no recollection of the conversation and had no idea what he would say.   DE-58-204-206.  Malone also had no idea of who Dr. Piercey was or what he would say.  DE-58:204-206.  The R&R's justification for Malone not calling these two witnesses contradicted the prosecutor's opening statement (that Miller's motive was to keep her job):

> the United States' argument about Miller's motivation and preference is logical: Miller worked at HP for 10 years, "turned down all the jobs offered by Llano (other than the one she started three days before her arrest)," and "her obvious preference was to keep her job at HP."
> DE-59:51

Had counsel been aware of what Llano and Piercey would say by conducting a reasonable investigation he would have been able to make an informed tactical decision about whether to call them to rebut the government's argument on motive.

### iv.  Karen Bryan

No one contacted Karen Bryan about the trial.

DE-59:40; DE-21-9.

v.    **Sandra Novack**

On the day of trial, Malone received a report from his investigator's interview

with Novack on May 17, 2013.  DE1-3:43. Novack provided key details to rebut Dr.

Gumer:

> Novak was not familiar with the intake process conducted by HP, but did state
> that her groups were comprised of patients who were legitimately dual-diagnosed
> with mental health and substance abuse issues. She was not aware of any situations
> in which patients who were "merely drug addicts or alcoholics" were brought in and
> "rubber stamped" by HP in order to bilk or defraud Medicare.
> *Id.*

> Novak said she was not contacted to be a trial witness.

DE-59:39-40; DE-21-4.

As a result of this incomplete investigation, counsel's decision not to call any

of these fact witnesses was an uninformed one that is not entitled to any deference.

This uninformed decision fails the performance prong of *Strickland*.

b.    <u>**Miller Was Prejudiced As a Result of Trial Counsel's Ineffectiveness**</u>

The R&R erroneously concluded that "Miller has not established the prejudice

necessary to grant her petition".  DE-59:105.  The R&R came to this conclusion by

categorizing the witnesses that were not called into two groups: (1) those who had

impermissible character evidence about Miller and/or (2) were not the type of

"smoking gun" witnesses who might make a difference in the trial outcome.  DE-

59:105-106.   Based on the government's theory of the case, Miller's proposed

witnesses would have offered evidence that was not character based and counsel's

failure to call them prejudiced Miller.

## 1.    Dr. Danziger or a Medical Expert:

The failure to speak to Dr. Danziger or move the Court to appoint a medical

expert to review patient files led to a failure to call a medical expert to support the

defense that either no fraud was occurring at HP or that it would not have been

obvious to Miller.

The R&R's rationale that the failure to call Dr. Danziger or another medical

expert was not prejudicial is based on flawed logic.  For example, the R&R found:

> Given this evidentiary record, Miller cannot establish that Malone's purported
> failure to sufficiently review patient files generated prejudice. How could Malone
> have demonstrated to a jury that patients received proper, necessary treatment if the
> patient files were fabricated? And how could he have demonstrated that patients
> were admitted for reasons unrelated to their Medicare eligibility? The answer is
> simple and obvious: he most likely could not have.
> DE-59:24.

Miller objected to this finding arguing:

> These conclusions arise out of several mistaken assumptions: First, that
> Gumer, Starkman and Kagan were telling the truth. Second, that a review of the
> patient files by witnesses not receiving a benefit from the government would fail to
> discredit Dr. Gumer's testimony in the eyes of the jury. Third, even if Dr. Gumer
> was truthful that he falsified file entries, it is a mistake to assume that a review of
> the files would not reveal that other entries were not falsified. Fourth, assuming
> arguendo Dr. Gumer falsified some entries in some files, it is a mistake to assume

that a review of the files could not reveal that, despite those false entries, those patients were still properly admitted, treated, and discharged at HP. Lastly, the corroboration of Daisy's testimony that she did not instruct Gumer to falsify any patient files would have called his accusations against her into question. DE-61:14-15.

Dr. Danziger testified that he received 36 patient charts of 19 different people with the smallest chart was perhaps 200 pages, some were over 500 pages. So, over the course of, roughly, a year, between May 2012 and May 2013, he reviewed three or four banker's boxes full of paper charts. *United States v. Kallen-Zury,* Case 1:17-cv-21269-JEM DE-54:13:14.

After a review of the medical charts, it was Dr. Danziger's opinion that these were patients who had long histories of psychiatric illness, most of them on Social Security disability due to chronic psychiatric illness. They were acutely ill, actively psychotic, at-risk for suicide, severely depressed, severely deteriorating in functioning.  The patients that were admitted were quite ill and in need of stabilization and intervention, directly refuting Dr. Gumer's testimony that over 99% of the patients were fraudulently admitted to the hospital.  Fifteen to eighteen separate professionals would on average make entries in the patient's charts and that it was opinion that all those notes in the charts were consistent and that it was unlikely that everyone "was in on it".

*Id.* at 19-20, 22, 23, 32, 59.

44

Prior to trial, and unbeknownst to Malone, Dr. Danziger specifically reviewed the files for the two patients that are identified in Counts 7 and 8 of the Indictment and found that the charts justified in-patient hospitalization, refuting the testimony of Dr. Gumer. DE31-1:32-47; *United States v. Kallen-Zury,* Case 1:17-cv-21269-JEM DE1-3:47-76; CRDE-312:105-106.

## 2.    **Robin Smith:**

Smith's testimony also rebutted the testimony of Dr. Gumer. DE-57:41-58.  If Dr. Gumer's assertion (that over 99% of the patients were improperly admitted) were true it follows that Smith would have known about it since she reviewed hundreds of patient files at HP and compared them to the hundreds of patients she treated.  Yet she testified that the notes in the charts matched the symptoms of the patients.  *Id.* Thus, the several hundred patient charts she reviewed were not falsified to justify the admission to HP.

## 3.    **Rita Sordellini:**

The R&R's findings detail why Sordellini was important to rebut the testimony of Dr. Gumer.   DE-59:76. Sordellini never noticed a pattern of inconsistencies in the files, had no recollection of other therapists noting inconsistencies or other concerns about the patients' files and saw no evidence that the patients did not need the services provided by HP.  Sordellini did not see

evidence of falsification in the entries and never heard of a plan to "stress the negative" in patient files.

### 4.      Sandra Novack, Roy Rindom, Michael Calabria and Karen Bryan

These were psychotherapists at HP who all saw patients, reviewed files, observed the conditions in the hospital, and would know if wholesale falsification or exaggeration of files, or the improper admission, treatment, and discharge of patients was occurring. They all interacted with Miller and would know if she was instructing therapists to "stress the negative." They would know if over 99% of the patients "didn't need to be there."  Their testimony would have rebutted Dr. Gumer's testimony.

### 5.   Melvin Hunter

Hunter ran the admissions department at HP for 14 years and he pre-screened people who wanted to be admitted to HP for treatment. The prescreening eliminated a majority of the potential patients before anyone at HP ever saw them.

Hunter testified that this process resulted in no more than 20-30% of the initial callers being admitted to HP and explained that perhaps 70% of the people who made it as far as the psychiatrist screening would be admitted. This contradicts evidence presented by the prosecution in the underlying trial that HP had a "95-97% admission rate." CRDE-296:130-139.

Hunter, testified that what the prosecutors identified at the trial as a "do not admit" list was actually a "call before admit" list. The list contained the names of patients whose Medicare or private insurance coverage had expired. However, Hunter testified lack of insurance coverage, or even inability to pay, did not keep HP from admitting patients who needed care. DE-57:209-212.

6.    **Manuel Llano and Dr. Michael Piercey**

In their opening statement the government argued that Miller's motive to commit the crimes alleged was simply to keep her job so Llano and Dr. Piercey were both important witnesses to rebut the narrative that Miller's motive to commit fraud at HP was simply to keep her job. Both witnesses would have testified that they offered Miller a job at other facilities multiple times while she was working at HP. DE-57:78-112. In other words, she did have other options for employment and did not need to commit fraud to remain employed.

## CONCLUSION

In conclusion, the Court should vacate the judgment and sentence and remand to the District Court for a new trial.

## CERTIFICATE OF COMPLIANCE WITH TYPE STYLE AND VOLUME

I HEREBY CERTIFY that the brief complies with the type-volume limitation and contains 12906 words.

s/Gennaro Cariglio Jr.
Gennaro Cariglio Jr.

## **CERTIFICATE OF COMPLIANCE WITH ELECTRONIC FILING**

I HEREBY CERTIFY that the brief has been, or shortly will be, provided to

the Court in electronic format as described in 11th Cir. R. 31-5.

s/Gennaro Cariglio Jr.
Gennaro Cariglio Jr.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed

and served using the CM/ECF system on this 31st day of January, 2022.

Respectfully submitted,

s/Gennaro Cariglio Jr.
Gennaro Cariglio Jr.
8101 Biscayne Blvd.
Penthouse 701
Miami, FL 33138
Florida Bar #:51985
(305) 899-0438
Atty. for the Appellant
Sobeachlaw@aol.com

47